# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| ROBERT PETERSON, and ) | |
| SCHOOL WIZZARD, INC., ) | |
| Plaintiffs, ) | |
| ) | No. 05 CV 3475 |
| v. ) | Judge Blanche Manning |
| ) | |
| VERIL L. OLSON, and EEL RIVER ) | |
| ACQUISITION CORP., ) | |
| Defendants. ) | |

## MEMORANDUM AND ORDER

Robert Peterson has developed technology—which he calls the School Wizzard—that allows schools to affordably give students computer access at their desks. But Peterson has had trouble marketing his patented technology because defendants Eel River Acquisition Corp. and Veril Olson allegedly failed to come through with a $10 million loan. Peterson and his company, School Wizzard, Inc. sued, and the defendants defaulted. The court entered an order of default, and must now determine what damages are due Peterson.

**Introduction**

The following facts alleged in the plaintiffs' amended complaint are deemed true as a result of the defendants' default. *In re Catt*, 368 F.3d 789, 793 (7th Cir. 2004). Eel River and Olson (presumably Eel River's owner or principal) agreed to loan School Wizzard, Inc. $10 million so that Peterson could produce a prototype and market his invention. In order to process the loan, the plaintiffs paid Eel River $250,000 in estimated application fees, to be refunded if the loan never occurred. Eel River repeatedly assured Peterson that the loan was on track, but for some reason that is not apparent to the court, over time it returned to Peterson all but $80,000 of the application fee. Additional assurances that the loan would materialize followed, but

eventually it fell through. The defendants failed to return the remaining $80,000 of the application fee.

Without the loan, Peterson used his own money to maintain his patent and market the School Wizzard, although he never produced a prototype. Peterson testified that the costs to maintain his patent and market the School Wizzard exceeded $363,000. In addition, he testified that he lost $46,000 in interest and dividends he would have earned on the application fee that Eel River held.

The bulk of Peterson's alleged damages resulted from his lack of a prototype, which Peterson contends left him unable to license his patent or sell his technology. He estimates that his first-year profits alone would have exceeded $70 million. He also testified that the value of his patent has diminished over time as a result of the defendants' failure to loan him money to produce a prototype. He estimates the loss in value of his patent to be $1.8 billion. In the complaint, the plaintiffs also ask that damages be trebled because the defendants' failure to loan them money violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), *see* 18 U.S.C. § 1962.

**Analysis**

Default proceedings consist of two stages—the establishment of the default, followed by the entry of the default judgment. *In re Catt*, 368 F.3d at 793. The first stage occurs when a defendant fails to appear in response to the summons and complaint served upon him. *Id.* After the defendant establishes default, the plaintiff must proceed to the second stage by establishing his entitlement to the relief he seeks. *Id.*; *see also* 10A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, 10A Federal Practice & Procedure, § 2688 at 63 (3d ed. 1998) ("Even after the

default, however, it remains for the court to consider whether the unchallenged facts constitute a legitimate cause of action.") Therefore, the plaintiff may not merely rest upon the allegations in the complaint. Instead, he must provide evidence to the court so that it may determine whether the complaint alleged a cause of action, as well as "ascertain the amount of damages with reasonable certainty." *Id.* (citing *Credit Lyonnais Securities (USA) v. Alcantara*, 183 F.3d 151, 155 (2d Cir. 1999)). A plaintiff normally establishes the reasonable certainty of its damages either by affidavit or during a damages hearing. *See* Fed. R. Civ. P. 55(b)(2); *Credit Lyonnais*, 183 F.3d at 154-55.

According to Peterson's complaint, the defendants' failure to loan him $10 million caused the following damages: (1) $80,000 in loan application fees which the defendants failed to return; (2) $46,000 of lost interest and dividends on the application fees the defendants wrongfully held; (3) $363,000 in out-of-pocket expenses to maintain and market his patent; (4) first-year lost profits of $70 million; and (5) $1.8-billion diminution over time in the value of his patent. However, at Peterson's damages hearing, the only damages he testified that he suffered were the $363,000 in out-of-pocket expenses and the $70-million in lost profits.

*Return of $80,000 of Loan Application Fee*

The court turns first to the $80,000 in application fees the defendants failed to return. According to the terms of the loan agreement as alleged by Peterson, the defendants were obligated to return the entire $250,000 application fee if the loan fell through (the amended complaint states that the loan agreement is attached, but in fact it is not). The defendants returned most of the application fee, but not the final $80,000. Accepting as true Peterson's allegation that the terms of the loan agreement required the defendants to return the application

fee if the loan fell through, the court concludes that Peterson is entitled to the return of his $80,000.

*Loss of Interest On Loan Application Fee*

Although Peterson is entitled to the return of his $80,000, the remainder of his requests for damages are too speculative. For instance, he offered no testimony to support his alleged loss of interest and dividends in the amount of $46,000. The court is therefore at a loss to know how he calculated that amount, or how he would have earned such a high rate of return.

*Expenses to Maintain and Market the Patent*

Peterson also seeks to be reimbursed for the more than $363,000 in expenses he allegedly incurred to maintain and market his patent. According to an expense sheet submitted by Peterson, his expenses included attorneys fees dating back to 1999 for maintaining his patent, tens of thousands of dollars paid to numerous consultants and promotional firms to publicize and market his technology, and thousands more in travel expenses.

According to Peterson, had he received the $10-million loan from the defendants, he would have paid these expenses out of the loan proceeds rather than out-of-pocket. But the very nature of a loan requires that it be repaid. Whether the expenses were paid initially from the loan or out-of-pocket is irrelevant; even if Peterson had paid them from the loan, he would eventually have had to repay the loan out-of-pocket. Accordingly, Peterson has identified no damage he suffered as a result of having to pay these expenses, and the court will award none.

*Loss of First-Year Profits of $70-Million*

Peterson also seeks damages in the amount of $70-million, his projected first-year profits. His request raises the threshold question of whether Peterson would be entitled to both the return

of his application fee (a request the court has granted), as well as damages consequent to the defendants' failure to loan him money. Without the loan agreement, the court cannot fully examine the question.

However, the court need not resolve the issue because Peterson is not entitled to lost profits as a result of his failure to substantiate them. Peterson testified that he based his projection of first-year lost profits on (1) an agreement to with an unidentified party to license his patent for $3 million, and (2) the favorable reaction he received when presenting his technology to others, leading him to conclude that additional "sales would come rather quickly."

Both bases of Peterson's projections are speculative. Although Peterson testified that he had a $3-million licensing agreement, the agreement itself states that it is contingent on "the production of a working prototype." Peterson also concedes that the licensing agreement was "contingent upon my producing workable prototypes." This contingency makes Peterson's request for damages too speculative. Had Peterson developed a prototype, he may have discovered that his technology was unworkable, or that it would not perform as planned. Upon seeing the prototype, the prospective licensee may have determined that it did not like what it saw, or that the technology did not meet its needs. Therefore, Peterson's request based upon the $3-million licensing agreement lacks the certainty needed to support his claim for damages. *In re Catt*, 368 F.3d at 793 (plaintiff must establish damages with reasonable certainty)*; Credit Lyonnais*, 183 F.3d at 154-55 (same).

Peterson's request for additional first-year profits, for a total of $70-million, is even more speculative. According to his testimony, his request is based upon favorable feedback he received after pitching his idea to various groups of educators. Peterson has submitted letters he

received from some of these educators in response to his pitch, which the court has carefully reviewed. None of the letters expresses a commitment to purchase Peterson's technology. In one, a director of a membership organization consisting of large school districts states merely that Peterson's technology "meshes with our vision," and the director promises to pass along information about the technology to the group's members. In another letter, a consulting firm asked Peterson for "further information" about the School Wizzard, including costs. Indeed, Peterson testified that he would never have entered into agreements with these groups because of his lack of a workable prototype: "I wouldn't enter into contracts without being able to display some kind of prototype."

Peterson also attempts to support his profit projections with numerous articles about various initiatives to provide low-cost laptop computers for students throughout the world. But even if one of these initiatives eventually resulted in large-scale purchases, nothing in the articles creates any certainty that the sales would have gone to Peterson, as opposed to other entities developing similar technologies.

*Diminution in Value of Patent*

Next, Peterson seeks damages in the amount of $1.8 billion based upon the loss in the value of his patent over time. Although Peterson testified that his patent has grown stale because he has been unable to market it, he offered no evidence of how he calculated the loss to be $1.8 billion. In the absence of any evidence whatsoever, his request for damages lacks the required certainty and is purely speculative. Accordingly, the court is unable to award him any damages due to the alleged diminution in value.

*Treble Damages Under RICO*

Peterson seeks treble damages and punitive damages under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962, 1964(c). Peterson has not identified under which subsection of § 1962 he is proceeding, but elements common to each subsection include (1) the existence of an enterprise, and (2) a pattern of racketeering activity. *See Starfish Inv. Corp. v. Hansen*, 370 F. Supp. 2d 759, 769 (N.D. Ill. 2005). Because claims under RICO are predicated upon fraud, Peterson's allegations must be made with particularity, as required under Federal Rule of Civil Procedure 9(b). *Pizzo v. Bekin Van Lines Co.*, 258 F.3d 629, 632 (7th Cir. 2001).

Peterson is not entitled to treble damages because he has failed to state a claim under RICO for two reasons. First, Peterson has alleged only a single fraudulent scheme involving only one injury to one person, which does not constitute a "pattern" of racketeering. *Id.*; *Slaney v. Int'l Amateur Athletic Federation*, 244 F.3d 580, 599 (7th Cir. 2001). Second, Peterson's allegations lack the particularity required under Rule 9(b). *See Pizzo*, 258 F.3d at 632.

*Attorneys Fees*

Finally, in his complaint Peterson has requested attorneys fees under several of his counts, including counts brought for fraud and under RICO. However, Peterson offered no testimony or documentation to substantiate his request for fees—in fact, he has never revealed what amount of fees he seeks. To be entitled to fees, Peterson needs to demonstrate that the fees he has requested are reasonable. *See Mathur v. Bd. of Trustees of So. Ill. Univ.*, 317 F.3d 738, 742 (7th Cir. 2003). Without even revealing what his request is, or how he arrived at it, the court cannot determine whether the request is reasonable, and therefore awards no attorneys fees.

**Conclusion**

Accordingly, judgment is entered in favor of plaintiffs Peterson and School Wizzard, Inc., and damages are awarded in the amount of $80,000.

ENTER:

DATE: May 2, 2006

_____
The Honorable Blanche M. Manning
United States District Judge